ST. JOSEPH DRUG COMPANY OF MASSACHUSETTS v. UNITED DRUG COMPANY, Appellant.—29 S. W. (2d) 107.

Division Two, June 11, 1930.

W. H. Woodward, John G. Parkinson, L. B. Gillihan and J. C. Leopard & Son for appellant; Fordyce, Holliday & White of counsel.

*William K. Amick* for respondent.

608

HENWOOD, C.—This is a suit for damages in the sum of $113,000, based upon the alleged breach of a contract originally made by and between the St. Joseph Drug Company, Incorporated, a Missouri corporation, the plaintiff's assignor, and the United Drug Company, a New Jersey corporation, the defendant's predecessor. The suit was filed in the Circuit Court of Buchanan County, and, upon the defendant's application for a change of venue, transferred to the Circuit Court of Daviess County. The trial in that court resulted in a verdict and judgment for the defendant. The plaintiff was granted a new trial, and from that order the defendant has perfected this appeal.

The contract (Plaintiff's Exhibit 1) reads as follows:

"PLAINTIFF'S EXHIBIT 1.

"AGREEMENT, made this seventeenth day of January, in the year one thousand nine hundred and eight, between the United Drug Company, a corporation organized under the laws of the State of New Jersey, and having its office and laboratory in the city of Boston, State of Massachusetts, Party of the First Part, and the St. Joseph Drug Company, Incorporated, at St. Joseph, Missouri, Party of the Second Part.

"WHEREAS, the party of the first part is in the business of making and selling the Rexall Remedies and other products.

"WHEREAS, the party of the second part has purchased from the party of the first part a portion of its capital stock, and desires to be appointed special selling agent of the party of the first part in the city of St. Joseph, Missouri.

"NOW, THEREFORE, this agreement, witnesseth, that the parties hereto, in consideration of the sum of one dollar, by each to the other paid, the receipt whereof is hereby acknowledged, hereby agree as follows:

"First: The party of the first part hereby constitutes and appoints the party of the second part its special selling agent in above named place, and agrees not to sell its products to any other dealer in said place, so long as the party of the second part shall perform the terms of this agreement.

"Second: The party of the first part hereby agrees that should the party of the second part become dissatisfied with the agency given him by this contract, or should the party of the second part feel that any misrepresentation has been made him by the party of the first part, or his representatives, he can by notifying the party of the first part, sell, and the party of the first part hereby agrees to purchase any capital stock of the United Drug Company that the party of the second part may hold, at its par value, plus seven per cent interest on the same since the date of issue, less any dividends that may have been applied, and the party of the first part furthermore agrees that in the event of the party of the second part notifying the party of the first part of his desire to sell his stock, the party of the first part will, in addition to buying his capital stock, take back any and all merchandise that the party of the second part may have on hand at the price such merchandise may have cost the party of the second part.

"Third: The party of the first part further agrees to keep a record of all advertising and other expenses directly charged to the territory of the party of the second part, and to credit said record with all purchases, said record to be open to inspection of the party of the second part.

"Fourth: The party of the second part agrees to uphold all of the products of the party of the first part to the full list retail prices set by the party of the first part, and further agrees never under any circumstances to sell or allow said products to be sold to the wholesale or retail dealers except at full retail price.

"Fifth: The party of the second part further agrees to confine the sale of the products of the party of the first part to his own retail stores and to consumers only, and it is mutually agreed and understood that in the event of any violation of the terms of articles fourth and fifth of this agreement by the party of the second part or its servants the party of the first part shall thereupon become entitled to and the party of the second part shall pay the sum of one hundred dollars as liquidated damages for each and every such violation.

"Sixth: In the event of the party of the second part owning the preferred stock of the United Drug Company, it is agreed by the party of the first part, if it is mutually agreeable, to waive the three years' redemption clause inserted in the preferred stock certificate, so long as the territory controlled by the party of the second part shall prove profitable to the party of the first part, and so long allow him to control said stock.

"Seventh: It is further agreed that the party of the second part will, in case he desires to sell the United Drug Company

610

stock, first offer it to the executive committee of the party of the first part, giving ten days' notice.

(Seal)              "UNITED DRUG COMPANY,

"LOUIS K. LIGGETT, General Manager.

(Seal)              "ST. JOSEPH DRUG CO., INC.,

"D. H. SPENCER, Treas.

"All conditions that exist in connection with this agreement are above stated."

The defendant, a Massachusetts corporation, concedes that, in 1916, at the time of its organization, it assumed the obligations of its predecessor, United Drug Company, a New Jersey corporation, under said contract. And, for the purpose of this opinion, it may be conceded that on April 16, 1923, the St. Joseph Drug Company, Incorporated, a Missouri corporation, assigned to the plaintiff, a Massachusetts corporation, its claim for damages arising out of the alleged breach of said contract, although the validity of said assignment and the plaintiff's right to prosecute this suit are challenged by the defendant.

In substance, it is alleged in the petition that, on January 17, 1908, the St. Joseph Drug Company, Incorporated, paid $2,000 for certain shares of the capital stock of the United Drug Company, the defendant's predecessor; that, in consideration of the purchase of said shares of stock and other considerations, said companies entered into a certain written contract (the contract shown above): that the St. Joseph Drug Company, Incorporated, performed all of its obligations under said contract; that, through the operation of its three retail drug stores in the city of St. Joseph, Missouri, it had a large and profitable trade in selling Rexall Remedies and other products of the defendant; that, by its efforts and the expenditure of its money in advertising and in otherwise promoting its sales of said merchandise, it increased its sales thereof and its profits therefrom, from year to year, for a period of thirteen years; that, in December, 1921, the defendant ceased to furnish it with said merchandise, and thereby breached said contract; that said merchandise was protected by the defendant's trade marks and could not be procured from any other source; that, because of the breach of said contract, it was deprived of profits of more than $6,000 per year from December, 1921, until April 20, 1923, the time of the filing of this suit, and will continue to be deprived of profits of more than $6,000 per year until the expiration of its charter, in October, 1940, its total loss of profits being $113,000; and that the plaintiff, by virtue of the assignment to it of said claim for damages, is entitled to judgment against the defendant in the sum of $113,000.

In its answer, the defendant, by various special pleas, challenges the validity of the assignment to the plaintiff of the alleged cause of action of the St. Joseph Drug Company, Incorporated, the right of the plaintiff to prosecute this suit, the jurisdiction of the Circuit Court of Buchanan County, and the legality of said contract; further answering, the defendant denies all of the allegations of the petition; and, further answering, the defendant says that its business is substantially a cooperative business; that each of its special selling agents is required to be a stockholder in the company; that its business and welfare, as well as that of each of its special selling agents, is dependent upon the good faith, zeal and efforts of all of its special selling agents; that the St. Joseph Drug Company, Incorporated, was well aware of all of these things at the time said contract was executed; that the St. Joseph Drug Company, Incorporated, failed to faithfully perform its obligations as one of the defendant's special selling agents; that, on the contrary, it kept and sold competitive products to such an extent that its sales of the defendant's products were less by far than the sales of the defendant's products in towns and cities much smaller in population than the city of St. Joseph, Missouri; that long prior to December, 1921, the defendant advised the St. Joseph Drug Company, Incorporated, of these conditions and requested it to put forth greater efforts to promote the sales of the defendant's products; that, notwithstanding such advice and such requests, the St. Joseph Drug Company, Incorporated, continued to undermine the defendant's business, the sales of the defendant's products, and the defendant's reputation and good will, until the defendant was compelled to cancel said contract; that, in connection with the notice of the cancellation of said contract, the defendant offered to purchase all of its products which the St. Joseph Drug Company, Incorporated, had on hand; that the defendant offered to purchase all shares of its capital stock then held by the St. Joseph Drug Company, Incorporated, which offer is now renewed; that said contract was cancelled by mutual consent; and that, at the time of the cancellation of said contract, the St. Joseph Drug Company, Incorporated, agreed that the defendant was at liberty to select and contract with another selling agent in the city of St. Joseph, Missouri.

The plaintiff's reply is a general denial.

The case was submitted to the jury on the issue of whether or not the St. Joseph Drug Company, Incorporated, used reasonable faithfulness, zeal and efforts to uphold the products of the defendant and to promote the sale of said products; in other words, on the issue of whether or not the defendant was justified in cancelling the contract in question. A general statement of the evidence bearing on this issue will be sufficient. For the sake of brevity, the St. Joseph Drug Company, Incorporated, will hereinafter be called

the St. Joseph Company and both the defendant and its predecessor will hereinafter be referred to as the defendant.

The testimony of the plaintiff's witnesses is to the following effect: From January 17, 1908, until December 19, 1921, the St. Joseph Company had the exclusive agency for the sale of the defendant's products in the city of St. Joseph, Missouri. Said products consisted of "Rexall Remedies," the "Pure Test" line, including epsom salts, turpentine, castor oil and camphor, the "Klenzo" and "Jonteel" lines of toilet articles, the pure food line, including candies, fountain fruits, powdered chocolate, teas, spices, etc., a line of surgical dressings, cotton and bandages, and a line of stationery, rubber goods, pharmaceuticals and sundries. The St. Joseph Company operated three retail drug stores in prominent business sections of the city of St. Joseph. Its stores were managed and conducted by men of ability and experience in that line of business. It cooperated with the defendant in upholding said products, and followed the suggestions of the defendant in giving its clerks special schooling and instructions concerning the merits of "Rexall Remedies" and in paying them a "five per cent bonus" on all sales thereof, in advertising and displaying all of said products, in advertising and conducting, periodically, special sales of some of said products at reduced prices, and adopted various other methods suggested by the defendant for the purpose of promoting the sale of said products. It purchased said products from the defendant in the following amounts:

| | |
|---|---|
| 1908 | $1037.00 |
| 1909 | 1578.00 |
| 1910 | 2463.00 |
| 1911 | 3333.00 |
| 1912 | 2091.00 |
| 1913 | 2770.00 |
| 1914 | 4175.00 |
| 1915 | 3250.00 |
| 1916 | 4022.00 |
| 1917 | 5294.14 |
| 1918 | 8317.00 |
| 1919 | 8044.00 |
| 1920 | 6055.00 |
| 1921 | 4288.00 |

Among the witnesses for the plaintiff were several druggists and other business men of St. Joseph who testified that the St. Joseph Company always featured the defendant's products and displayed the same continuously in a prominent way.

The plaintiff offered in evidence five letters (Plaintiff's Exhibits 8, 7, 7A, 5 and 6), dated May 31, 1917, February 2, 1918, September

11, 1918, May 12, 1921, and December 19, 1921, received by the St. Joseph Company from the defendant. In the first letter, the defendant advised the St. Joseph Company that the amount of its purchases of the defendant's products during the preceding year was far below the general average amount purchased by the defendant's selling agents in other cities of approximately the same size as St. Joseph, and requested the St. Joseph Company to furnish the defendant with the amount of its "total gross sales" for the year 1916. In the next three letters, the defendant advised the St. Joseph Company that its purchases of the defendant's products were less than the purchases of the defendant's sellings agents in cities much smaller than St. Joseph, that the defendant was dissatisfied with the management of the St. Joseph agency, and that, unless the St. Joseph Company increased the amount of its purchases, the defendant would be compelled to select another selling agent in the city of St. Joseph. The last letter, in which the St. Joseph Company was notified of the cancellation of its contract with the defendant, contains the following:

"As you have not conducted the agency in a manner satisfactory or profitable to the United Drug Company, and you have not given our products the proper representation, display, advertising and sales which is expected and required of an exclusive selling agency. The fact that your purchases from us are below the general average amount reasonably expected and required for a town of your size, it is conclusive evidence that the selling agency has not been a profit or value to you or to us. Your failure through neglect or inability to develop, promote and maintain a substantial market for our goods in your locality is sufficient ground, we believe, why it is for our mutual advantage to discontinue our business relationship."

R. C. Callison, president of the St. Joseph Company and chief witness for the plaintiff, testified, on cross-examination: None of the letters above mentioned were answered by his company, because they "called for no answer." He was not familiar with the drug business in other cities of the size of St. Joseph. After his company received these letters, he made no investigation of the methods used by the defendant's other selling agents to promote their sales of the defendant's products. He knew that the defendant was a cooperative company and that its stockholders were composed of retail druggists who handled its products as exclusive selling agents. His company had received annual dividends of seven per cent on its stock in the defendant company since 1908. His company still owned said stock, and it was not for sale.

The evidence offered by the defendant may be summarized as follows: Its products were handled exclusively by selling agents who were required to be stockholders in the company and to cooperate with the company in advertising, displaying and otherwise pro-

moting the sale of said products. It furnished advertising and display matter for the use of its selling agents, and it also furnished experts who studied the business prospects of its selling agents and suggested ways and means of increasing their sales of said products. For several years prior to 1921 the St. Joseph Company did not use this advertising and display matter, nor take advantage of the services of these experts, nor follow the suggestions of the defendant concerning special sales and other trade inducements, nor give preference to the defendant's products in display or sales effort. The defendant's selling agents in other towns and cities used the advertising and display matter and the expert service furnished by the defendant with great success, and, by cooperating with the defendant in these and other particulars, expanded the volume of their business and increased their sales of the defendant's products. Some of these selling agents and other representatives of the defendant visited the stores of the St. Joseph Company and offered Mr. Callison suggestions as to how his company might build up its trade in the defendant's products and increase its sales thereof, but he did not seem to be interested in such suggestions. In 1920 the amount of the St. Joseph Company's purchases of the defendant's products was about one-third of the average amount purchased by the defendant's selling agents in fifteen cities of approximately the same size as the city of St. Joseph. In 1918, 1919, 1920 and 1921 the amounts of the St. Joseph Company's purchases of the defendant's products ranged from one-fifth to one-half of the amounts purchased by the defendant's selling agents in three cities of approximately the same size as the city of St. Joseph.

E. G. Kathan, the defendant's selling agent at Trenton, Missouri, testified: R. C. Callison visited his store in Trenton "once or twice a year" from 1917 to 1921. They often discussed the "Rexall Agency at St. Joseph." He asked Mr. Callison why he did not "buy more goods" from the United Drug Company. "Mr. Callison said that he wasn't interested in the United Drug Company or featuring their merchandise." Mr. Callison also said "he would only buy certain lines of the products of the United Drug Company."

Joseph W. Hall, one of the defendant's traveling salesmen, testified: In August, 1921, he called on R. C. Callison and was told to see William Callison, who was referred to as the "Rexall man." He and William Callison "talked over the Rexall line for about two hours." He told Callison that "towns like Brookfield and Chillicothe and Macon" were buying as many of the defendant's products as his company and that his company should make "a better showing." He noticed that Callison's company had a competitive line of rubber goods "on display." About a week later he talked to William Callison again. He asked Callison "if

it wouldn't be a good idea to take on the whole line" of the defendant's products, and Callison said "he would give up the whole line first." He then suggested that Callison return the defendant's products and "buy goods" which he expected "to push," and Callison said "maybe he would." Callison asked him "to go to supper," and he declined. Callison then said: "While I am eating, if you want to go around and look over the town with these other stores, with a view of placing your line elsewhere, why, go ahead."

In rebuttal for the plaintiff, R. C. Callison related a conversation which he had with E. G. Kathan in July or August, 1924, after the first trial of this case. He testified that, while in Kathan's store on that occasion, he said to Kathan: "You had better look at your contract and see what you have." Kathan looked at his contract and said: "I will take this over and put it in the vault. This is a valuable paper. Sometime they might get some young fellow in this town and take this line."

William Callison, also, testified in rebuttal for the plaintiff. He said he had "charge of the buying of the Rexall Goods" for the St. Joseph Company, and that he was connected with that company until July 1, 1922. He admitted that, in 1921, he had a conversation with the defendant's witness Hall, but denied making the statements attributed to him by this witness. He further said: "I told him (Hall) we were selling all we could sell, and we couldn't buy any more unless he could see an outlet, but we wanted to handle all we could sell, all we could use." And he further said that Hall "voluntarily left his address," and that Hall offered to come back and "check off" all of the defendant's products on hand if the company decided to return them to the defendant.

I. The order granting the plaintiff a new trial contains the following recital: "The plaintiff's motion for a new trial herein is taken up and considered by the court, and is by the court sustained because of the error of the court in giving the defendant's instructions numbered one to six, inclusive." The plaintiff now complains only of the defendant's instructions 2, 3 and 6. The defendant's instructions 1 to 6 follow:

"1. Under the instrument of January 17, 1908, it became and was the duty of the St. Joseph Drug Company of Missouri, to uphold all of the products of the United Drug Company, and to use reasonable faithfulness, zeal and effort, as these terms are defined in other instructions, to promote the sale of all of the products of the United Drug Company.

"2. If you find and believe from the evidence that at the time the instrument of 1908, between the United Drug Company and the St. Joseph Drug Company of Missouri, was executed, the St. Joseph Drug Company of Missouri knew that the United Drug

Company did not permit its products to be sold except through druggists who might be stockholders in the United Drug Company, and if you further find and believe from the evidence that the St. Joseph Drug Company of Missouri knew that the plan of business of the United Drug Company consisted in appointing its stockholders as special or exclusive selling agents, and if you further find and believe from the evidence that the St. Joseph Drug Company of Missouri knew that the success of the United Drug Company depended upon the faithfulness and zeal of such special selling agents, then you are instructed that in accepting the special selling agency at St. Joseph, Missouri, the St. Joseph Drug Company of Missouri was bound to give to the United Drug Company that degree of faithfulness, zeal and effort which in the reasonable and ordinary conduct of business affairs would be expected from a person having an exclusive selling agency from a company conducting business in such manner.

"If you find and believe from the evidence that the St. Joseph Drug Company of Missouri knowingly conducted its business, or used business methods which were not calculated to give the United Drug Company the faithfulness, zeal and effort which you would expect in the ordinary conduct of business under the circumstances set out in this instruction, if you so find the facts; and you are further instructed if you should find and believe from the evidence, that the St. Joseph Drug Company of Missouri failed and refused to use reasonable zeal and reasonable sales efforts, which would ordinarily reasonably be expected in the reasonable conduct of business by one having a special selling agency under the circumstances set out above, if you find all such circumstances to be true, then you are instructed that the St. Joseph Drug Company of Missouri violated its duty to the United Drug Company, and under these circumstances, if you find them to be true, the United Drug Company was perfectly justified in terminating the agency, and your verdict must be in favor of the United Drug Company.

"3. You are instructed that the document of January 17, 1908, created a special selling agency. It is a rule of law, applying to such agencies, that the agent must at all times conduct his business for the person appointing him agent with good faith for the purpose of furthering the business and sales of the agency.

"To put it another way, the agent must at all times exercise his best endeavor to use reasonable skill and business judgment in conducting the business of the selling agency. He must at all times uphold the products forming the basis of the agency and uphold the business of the one appointing him, pertaining to such products.

"A failure of the agent to so conduct himself would be sufficient cause for revoking and terminating the agency, and if you find and

believe from the evidence that the St. Joseph Drug Company of Missouri so failed, your verdict must be for the United Drug Company.

"4. The court instructs the jury that by faithfulness, zeal and effort to uphold the products of the United Drug Company is meant such reasonable faithfulness, zeal and effort as would be reasonably expected from an ordinarily diligent and faithful person having an exclusive selling agency, in behalf of his principal, in the same or similar line of business under similar conditions.

"5. The court instructs the jury that if you find and believe from the evidence that the St. Joseph Drug Company of Missouri, acting under the contract mentioned in evidence as Plaintiff's exhibit No. 1, by its course of conduct claimed and required that defendant should not under said contract sell Rexall products to any other druggist in the city of St. Joseph, Missouri, and the United Drug Company adopted and assented to such course of conduct, then as to such products with reference to which it made said claim it was the duty of the St. Joseph Drug Company of Missouri to uphold all of such products of the United Drug Company, and to use at all times reasonable faithfulness, zeal and effort, as those terms are defined in other instructions, to promote the sale of all such products of the United Drug Company in the city of St. Joseph, Missouri.

"6. It is no part of your duty to consider what motives may have prompted the United Drug Company to terminate the agency in December, 1921. Their motives, if any, their feelings, if any, are immaterial. The only question is, did the St. Joseph Drug Company in good faith give to the United Drug Company that reasonable faithfulness, zeal and effort required by other instructions given you. If you find they did not do so, then the United Drug Company had a right to terminate the agency regardless of their motives or feelings."

The record discloses that the defendant's Instruction 1 was given "without objection on the part of the plaintiff, and with the consent and agreement of the plaintiff." This instruction advised the jury as to the duty of the St. Joseph Company under its contract with the defendant. The Defendant's instructions 2, 3, 4 and 5 explained the terms used in the defendant's Instruction 1 in declaring the duty of the St. Joseph Company under the contract. In addition to such explanation, the defendant's instructions 2 and 3 advised the jury that, if the St. Joseph Company violated its duty under the contract, the defendant was justified in canceling the contract, and predicated a verdict for the defendant upon a finding that the St. Joseph Company violated its duty under the contract. The defendant's Instruction 6 advised the jury, in effect, that the only question for their consideration was whether or not

the St. Joseph Company performed its duty under the contract, as explained in other instructions, and that, if the St. Joseph Company did not perform its duty under the contract, then the defendant had the right to cancel the contract.

The plaintiff not only consented to the giving of the defendant's Instruction 1, but, in its own instructions, explained the duty of the St. Joseph Company under the contract in question in substantially the same language as that used in the defendant's instructions 2, 3, 4 and 5. Moreover, the plaintiff's instructions advised the jury that, if the St. Joseph Company performed its duty under the contract, the defendant was not justified in canceling the contract, and predicated a verdict for the plaintiff upon a finding that the St. Joseph Company performed its duty under the contract.

Thus it appears that the plaintiff and the defendant agreed upon a construction of the contract in question, and that the case was submitted to the jury on the issue of whether or not the St. Joseph Company used reasonable faithfulness, zeal and efforts to uphold the products of the defendant and to promote the sale of said products; or, to put it in another way, on the issue of whether or not the defendant was justified in canceling the contract. This is a sufficient answer to the contention now made by the plaintiff, that the defendant's instructions 2 and 3 "ignored the provisions of the contract." And there is no merit in the contention that the defendant's instructions 2, 3 and 6 were misleading. After a careful consideration of all of the instructions in the case, we find nothing of which the plaintiff can justly complain in the defendant's instructions 2, 3 and 6, nor in any of the defendant's other instructions which were specified as erroneous by the trial court. The plaintiff has suggested no other grounds for a new trial. It is our conclusion, therefore, that the plaintiff is not entitled to a new trial.

II. In view of this conclusion, it becomes unnecessary to consider the questions raised by the demurrers to the evidence.

The order granting the plaintiff a new trial is reversed and the cause remanded with directions to the trial court to reinstate the verdict and judgment for the defendant. *Davis* and *Cooley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.